

2013 JUL 22 PM 1:24

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| PETER VANDERHOOF and JANE VANDERHOOF, husband and wife,<br><br>    Appellants,<br><br>    v.<br><br>BERNARD W. MILLS and HEDY L. MILLS, husband and wife; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation; PENINSULA MORTGAGE, INC., a Washington corporation; FLAGSTAR BANK, FSB; and all other persons or parties unknown claiming any right, estate or interest in the real estate described in the complaint herein,<br><br>    Respondents. | No. 70343-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED:  July 22, 2013 |

LEACH, C.J. — In this boundary dispute, Peter and Jane Vanderhoof challenge the sufficiency of the evidence to support the trial court's decision dismissing their adverse possession and mutual recognition and acquiescence claims and quieting title to the disputed property in Bernard W. and Hedy Mills (collectively Mills).   Because substantial evidence supports the trial court's findings, we affirm.

## Background

Richard and Jean Liljedahl owned approximately 60 acres of real property in Clallam County.  In 1970, the Liljedahls conveyed approximately four acres in

the northwest corner of this property to Mrs. Liljedahl's brother-in-law and sister, Dana and Joyce Lothrop.[1] At the time, the Lothrops lived in California and did not view the property. The Liljedahls conveyed the property based on a legal description; no marker identified the southern boundary of the property conveyed.

Around 1971, the Lothrops moved to Washington and began to build a house on their property. A fence was built on the south side of the Lothrops' property to keep the Liljedahls' cattle off the property. William Wasankari, Mrs. Liljedahl and Mrs. Lothrop's father, was involved in determining the fence's location, but Mr. Lothrop was not involved. The Liljedahls ran cattle on all of their property except for the area around their house and certain outbuildings where they "fenced out" the cattle.

The Lothrops sold their property to Mel Black in 1976, whose estate sold it to Robert and Sally Abelson in 2001. Donna Nagy purchased the property in 2004 and sold it to Mills in July 2006. The statutory warranty deed described the property as follows:

> THAT PORTION OF TRACT 7, PORT CRESCENT FARM AND DAIRY TRACTS AS PER PLAT RECORDED IN VOLUME 1 OF PLATS, PAGE 96 1/2, RECORDS OF CLALLAM COUNTY, WASHINGTON, IN SECTION 11, TOWNSHIP 30 NORTH, RANGE 08 WEST, W.M., DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID TRACT 7; THENCE SOUTH ALONG THE WEST LINE THEREOF 208 FEET; THENCE EAST PARALLEL WITH THE NORTH LINE OF SAID TRACT 7 A DISTANCE OF 880 FEET; THENCE NORTH 208 FEET TO THE

---

[1] Finding of fact 9 reads "1990," but finding of fact 12 refers to "1970." Both briefs state "1970."

NORTH LINE OF SAID TRACT 7; THENCE WEST ALONG SAID NORTH LINE 880 FEET TO THE POINT OF BEGINNING; EXCEPT THE WEST 30 FEET FOR COUNTY ROAD. SITUATE IN CLALLAM COUNTY, STATE OF WASHINGTON.

In 1999, the Vanderhoofs acquired property from the Liljdahls by statutory warranty deed. The deed identified the property as follows:

PARCEL A:

Tracts 7 and 10 in Section 11, Township 30 North, Range 8 West, W.M. of Puget Sound Mill and Timber Company's Port Crescent Farm and Dairy Tracts, as per Plat thereof recorded in Volume 1 of Plats, page 96 1/2, records of Clallam County, Washington, EXCEPT that portion of said Tracts 7 and 10 described as follows: Beginning at a point in the West line of said Tract 10 a distance of 52 feet South of the Northwest corner thereof; Thence East parallel with the North line of said Tract 10 a distance of 210 feet; Thence North parallel with the North line of said Tract 10 a distance of 210 feet; Thence North parallel with the West line of Tracts 7 and 10 a distance of 98 feet, more or less, to the Southerly line of a private road now in use on said Tract 7; Thence Westerly along the Southerly line of said private road to the West line of said Tract 7; Thence South along the West line of Tracts 7 and 10 a distance of 119 feet, more or less, to the POINT OF BEGINNING. ALSO EXCEPT the West 30 feet of the South half of the Northwest quarter of the Northeast quarter conveyed to Clallam County for road purposes by Deed recorded January 3, 1969 under Auditor's File No. 386807, records of Clallam County, Washington.

ALSO EXCEPT that portion thereof conveyed to Dana G. Lothrop and Joyce M. Lothrop, husband and wife, by Deed recorded August 27, 1971 under Auditor's File No. 405954, records of Clallam County, Washington, being more particularly described as follows: That portion of Tract 7 in Section 11, Township 30 North, Range 8 West, W.M. of Puget Sound Mill and Timber Company's Port Crescent Farm and Dairy Tracts, as per Plat thereof recorded in Volume 1 of Plats, page 96 1/2, records of Clallam County, Washington, described as follows:

Beginning at the Northwest corner of said Tract 7; Thence South along the West line thereof 208 feet; Thence East parallel with the North line of said Tract 7 a distance of 880 feet; Thence North 208 feet to the North line of said Tract 7; Thence West along said North

line 880 feet to the POINT OF BEGINNING. EXCEPT the West 30 feet for County Road.

In 2007, Mills had a survey performed that identified and marked the northern and southern boundaries of their property. It located the southern boundary approximately 43 feet south of the fence on the west side and very close to the southeast fence corner on the east. The survey also located the northern boundary approximately 43 feet south of the north fence on the west side and very close to the northeast corner on the east. The survey disclosed a small discrepancy between the boundary line and a fence located on the property's east side connecting the first two fences. Following the survey, Mr. Mills placed "No Trespassing" signs along the identified southern boundary.

In 2010, the Vanderhoofs filed this quiet title action, claiming the southerly fence as the mutual boundary, based upon adverse possession, mutual recognition and acquiescence, and transfer by a common grantor with reference to a certain boundary.[2] Mills filed a counterclaim seeking to quiet title based upon the legally described boundaries. At the close of the Vanderhoofs' case in chief, Mills moved to dismiss under CR 41(b)(3). On November 15, 2011, the trial court orally granted this motion. On February 3, 2012, the court entered

---

[2] In the complaint, the Vanderhoofs requested "an order quieting title in the plaintiffs to a portion of defendants' legally described property between the plaintiffs' legally described north line and the above described fence line located on defendants' property . . . based on adverse possession, mutual recognition and acquiesce and transfer by a common grantor with reference to a certain boundary." They also requested "an order quieting title in the plaintiffs to a portion of defendants' legally described property between the plaintiffs' legally described west line and the above described fence line located on defendants' property . . . based on adverse possession, mutual recognition and acquiesce and transfer by a common grantor with reference to a certain boundary."

findings of fact, conclusions of law, and judgment, quieting title to the disputed property in Mills and also awarding statutory costs and attorney fees to Mills. The trial court made the following pertinent findings:

> 15. The Lothrops sold their property to Mel Black and his wife in 1976. No testimony was presented as to the Blacks' recognition of the fence as their south boundary. The Blacks, together with the Black trust, owned what is now the Mills' property from 1976 to 2001. Similarly, there was no testimony that the Abelsons (who owned from 2001 to 2004) or that the Donna Nagy Trust, recognized or acquiesced in the fence as the boundary. The Court finds the evidence on mutual acquiescence is insufficient to meet the Plaintiffs' burden of proof. Even viewed in a light most favorable to the Plaintiffs, the Court is unable to find from the evidence that the fence was recognized and acquiesced in as the boundary by the property owners on both sides for the required period of time.
>
> . . . .
>
> 17. Weighing the evidence, the Court finds that the fence originally constructed when the Lothrop house was being built was constructed primarily for the purpose of keeping the Liljedahl cattle off of the Lothrop property. The Liljedahls ran cattle on the entirety of their remaining property with the exception of the area around their house and certain outbuildings where they "fenced out" the cattle. The Court finds that the running of the cattle was not "hostile" in the sense required by the law of adverse possession and did not put the Lothrops or their successors on notice that a claim of ownership was being made adverse to their interests.
>
> . . . .
>
> 20. Weighing the evidence, the Court finds that the acts of the Vanderhoofs in the area where ownership is claimed, while more substantial as time went on, did not meet the elements of adverse possession for a continuous period of 10 years. The Vanderhoofs acquired their property in 1999. The first evidence of any activity on their part in the area to which they now claim ownership was sometime in the year 2000 when Mr. Vanderhoof testified he mowed some of the area with a rotary mower on a tractor for the stated purpose of controlling noxious weeds. There is no evidence that this conduct was observed or should have been observed by the neighbor to the north which at the time was Mr. Black. The testimony shows that Mr. Black was very ill at this time and did not often get out of the house. After Mr. Black died his estate/trust sold the property to the Abelsons in August, 2001.

There was testimony that Mr. Vanderhoof planted some saplings in the area south of the fence in 2001 but no indication that this act was observed or should have been observed by the neighbor to the north. The testimony also shows that such saplings grow wild in this area. The Court finds that those saplings growing wild cannot be distinguished from those planted so as to put a neighbor on notice that planting has occurred. Weighing the evidence, the Court finds that the acts by the Vanderhoofs prior to 2003 were not sufficient to put the title owner on notice that an adverse claim of ownership was being made and did not otherwise meet the required elements of adverse possession.

The court also entered the following disputed conclusion of law:

8.  . . . Under the circumstances presented here the Vanderhoofs were on notice, by virtue of their deed, that the legal description of the Mills' property was not included in their purchase. Therefore, any attempt by the Vanderhoofs to tack use by the Liljdahls, even if adverse, would be inapplicable to the Vanderhoofs as the Mills property was specifically excluded from their conveyance and therefore precludes tacking.

The Vanderhoofs appeal.

Analysis

Standard of Review

In a bench trial, CR 41(b)(3) permits the trial court to dismiss a plaintiff's action after a plaintiff has completed the presentation of its evidence "'if there is no evidence, or reasonable inferences therefrom, that would support a verdict for the plaintiff.'"[3] Under this rule, a trial court "'may either weigh the evidence and make a factual determination that the plaintiff has failed to come forth with credible evidence of a prima facie case, or it may view the evidence in the light

---

[3] Stieneke v. Russi, 145 Wn. App. 544, 568 n.5, 190 P.3d 60 (2008) (quoting Willis v. Simpson Inv. Co., 79 Wn. App. 405, 410, 902 P.2d 1263 (1995)).

most favorable to the plaintiff and rule, as a matter of law, that the plaintiff has failed to establish a prima facie case.'"[4]

If the court dismisses the case as a matter of law at the close of the plaintiff's case, we apply a de novo standard of review, and "the question on appeal is whether the plaintiff presented a prima facie case, viewing the evidence in the light most favorable to the plaintiff."[5] But if the trial court acts as a fact finder, we limit our review to whether substantial evidence supports the trial court's findings and whether the findings support its conclusions of law.[6] Substantial evidence is "a quantum of evidence sufficient to persuade a rational, fair-minded person that the premise is true."[7] If substantial evidence exists, "we will not substitute our judgment for that of the trial court even though it may have resolved a factual dispute differently."[8]

We look to the context of the trial court's oral ruling and order to determine whether the court granted the CR 41(b)(3) motion by weighing the facts as compared to ruling as a matter of law.[9] "Entering findings strongly suggests that the trial court weighed the evidence because no findings or conclusions are

---

[4] In re Adoption of S.H., 169 Wn. App. 85, 100, 279 P.3d 474 (2012) (quoting In re Dependency of Schermer, 161 Wn.2d 927, 939, 169 P.3d 452 (2007)).

[5] S.H., 169 Wn. App. at 100-01 (quoting Commonwealth Real Estate Servs. v. Padilla, 149 Wn. App. 757, 762, 205 P.3d 937 (2009)).

[6] S.H., 169 Wn. App. at 100-01 (quoting Commonwealth Real Estate Servs., 149 Wn. App. at 762).

[7] Stieneke, 145 Wn. App. at 566 (citing Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000)).

[8] Stieneke, 145 Wn. App. at 566.

[9] S.H., 169 Wn. App. at 101 (citing Schermer, 161 Wn.2d at 940-41).

required when the court views the evidence in the light most favorable to the plaintiff and rules as a matter of law."[10] Here, the court's oral ruling and order, including its 24 findings of fact, indicate that it weighed the evidence and made a factual determination that the Vanderhoofs failed to establish an essential element of each claim.

As an initial matter, Mills argue that Vanderhoofs' brief fails to comply with RAP 10.3(a)(5)[11] because "[r]ather than referring to the Report of Proceedings, Vanderhoofs repeatedly refer to factual arguments made in their summary judgment motion and supporting documentation as indicative of evidence presented at trial." Mills also contends that the brief fails to comply with RAP 10.3(g),[12] claiming, "While Appellants have globally assigned error to the trial court's findings of fact and conclusions of law, they have not set forth or cited by number any specific finding that is claimed to be unsupported or otherwise in error." Additionally, Mills asserts, "Nor is there any discussion of the evidence or

---

[10] S.H., 169 Wn. App. at 101 (citing Schermer, 161 Wn.2d at 940).
[11] RAP 10.3(a)(5) states, "The brief of the appellant or petitioner should contain . . . . [a] fair statement of the facts and procedure relevant to the issues presented for review, without argument. Reference to the record must be included for each factual statement."
[12] RAP 10.3(g) states,
> A separate assignment of error for each instruction which a party contends was improperly given or refused must be included with reference to each instruction or proposed instruction by number. A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number. The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto.

-8-

discussion of a factual basis in the record to indicate that the trial court's findings are unsupported."

First, while RAP 10.3(a)(5) does require citations to the evidentiary record considered by the trial court and RAP 10.3(a)(g) requires a separate assignment of error for each challenged finding, RAP 1.2(a) requires that we interpret the appellate rules liberally "to promote justice and facilitate the decision of cases on the merits." The Vanderhoofs' briefing makes clear the decisions that they challenge. Mills' responsive brief demonstrates that they understand the nature of the Vanderhoofs' challenges and the findings at issue. "When a brief clearly discloses what action is considered erroneous and the opposing party has had no difficulty responding to the issue, an appellate court may consider the party's argument."[13] Thus, the deficiencies in Vanderhoofs' briefing do not warrant dismissal of their appeal.

Vanderhoofs challenge the court's tacking analysis, its findings of fact supporting the "open and notorious" and "hostile" elements of adverse possession, and its finding that no mutual recognition and acquiescence occurred. Because substantial evidence supports the trial court's findings, we do not reach the tacking issue.

---

[13] Honegger v. Yoke's Wash. Foods, Inc., 83 Wn. App. 293, 295 n.2, 921 P.2d 1080 (1996) (citing Podiatry Ins. Co. of Am. v. Isham, 65 Wn. App. 266, 268, 828 P.2d 59 (1992)).

Adverse Possession

The Vanderhoofs challenge the trial court findings that their activities on the disputed land were neither open and notorious nor hostile as required to establish adverse possession. Under the doctrine of adverse possession, a party can acquire legal title to another's land by possessing the property for at least 10 years in a manner that is "'(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile.'"[14] Title vests automatically in a claimant who satisfies all of these elements throughout the 10-year period.[15] "Where there is privity between successive occupants holding continuously and adversely to the true title holder, the successive periods of occupation may be tacked to each other to compute the required 10-year period of adverse holding.'"[16]

Adverse possession occurs if a party uses property "'as if it were his own, entirely disregards the claims of others, asks permission from nobody, and uses the property under a claim of right.'"[17] A true owner's occasional, transitory use usually will not prevent adverse possession "'if the uses the adverse possessor permits are such as a true owner would permit a third person to do as a

---

[14] Gorman v. City of Woodinville, 175 Wn.2d 68, 71, 283 P.3d 1082 (2012) (quoting ITT Rayonier, Inc. v. Bell, 112 Wn.2d 754, 757, 774 P.2d 6 (1989)).

[15] Gorman, 175 Wn.2d at 72 (citing El Cerrito, Inc. v. Ryndak, 60 Wn.2d 847, 855, 376 P.2d 528 (1962)).

[16] Lilly v. Lynch, 88 Wn. App. 306, 312-13, 945 P.2d 727 (1997) (quoting Roy v. Cunningham, 46 Wn. App. 409, 413, 731 P.2d 526 (1986)).

[17] Standing Rock Homeowners Ass'n v. Misich, 106 Wn. App. 231, 239, 23 P.3d 520 (2001) (quoting Granite Beach Holdings, LLC v. Dep't of Natural Res., 103 Wn. App. 186, 200, 11 P.3d 847 (2000)).

"neighborly accommodation.""[18] If the land at issue is vacant, open, unenclosed, and unimproved, we presume that the use is permissive.[19] "'The ultimate test is the exercise of dominion over the land in a manner consistent with actions a true owner would take."[20]

The Vanderhoofs claim that "the grazing of cattle, the corresponding perimeter fencing, and the Liljedahls and Vanderhoofs continued maintenance of the disputed area is sufficient to satisfy the elements of hostility and open and notorious." Even if we use the filing of this lawsuit in March 2010 as the point in time when Mills interrupted the Vanderhoofs' acts of adverse possession, we hold that substantial evidence supports the trial court's finding that the Vanderhoofs did not meet the notice and hostility elements of adverse possession for a continuous 10-year period.

Vanderhoofs called four witnesses: themselves, Dana Lathrop, and their predecessor, Jean Liljedahl. The area in dispute was wild and undeveloped. Neither Lathrop nor Liljedahl could recall how the property corners were marked at the time of the Lathrop acquisition. Lathrop had no recollection of ever thinking about the fence as a boundary line. Neither Lathrop nor Liljedahl could testify how the location for the fence was determined. Liljedahl testified that the specific reason for building the disputed fence was the same as the principal

---

[18] Lilly, 88 Wn. App. at 313 (quoting 17 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 8.19, at 516 (1995)).
[19] Standing Rock Homeowners Ass'n, 106 Wn. App. at 239 (quoting Granite Beach Holdings, 103 Wn. App. at 200).
[20] Lilly, 88 Wn. App. at 313 (quoting ITT Rayonier, 112 Wn.2d at 759).

purpose of the fences on her property—to keep her cattle from getting out and other cattle from getting in. She never maintained the fence and never personally saw maintenance by anyone else. Mrs. Liljedahl agreed that trees grew up naturally in the disputed area. Vanderhoofs presented no evidence of maintenance of the disputed property before the Vanderhoofs purchase and only sporadic use.

The Vanderhoofs raised no livestock on their property, and Mrs. Vanderhoof testified that she did not maintain the fence or observe others doing so. Mr. Vanderhoof testified that in 2000, he "put the rotary mower on my tractor and rotary mowed the entire area south of that fence separating us from the Mills' property, I rotary mowed all of that even through the woods, pretty much all the way up to Salt Creek .... to mostly control the noxious weeds." The Vanderhoofs do not dispute the trial court's finding that "[t]here is no evidence that this conduct was observed or should have been observed by the neighbor to the north which at the time was Mr. Black." Therefore, this act would not have put Mr. Black on notice that the Vanderhoofs were challenging his title to the land.

The Vanderhoofs also allege that they adversely possessed the land based upon their acts in 2001, when Mr. Vanderhoof planted saplings south of the fence. But no evidence shows that the Vanderhoofs took any action to maintain or cultivate those trees or the land surrounding the trees throughout the statutory period. Additionally, no evidence shows that the neighbor to the north

observed or should have observed this act. Further, the trial court found that these saplings grow wild in the area and that "those saplings growing wild cannot be distinguished from those planted so as to put a neighbor on notice that planting has occurred." "[A] person claiming adverse possession must and would take some steps to care for the trees."[21] And the lack of a visual difference between the saplings leads us to conclude that this act of planting does not satisfy the notoriety and hostility elements required for adverse possession.[22]

The Vanderhoofs also base their claim on acts that took place during or after 2003. Because the trial court found no act before 2003 sufficient to give notice of an adverse claim, the acts taking place during or after 2003 could not satisfy the elements of adverse possession for a continuous 10-year period. Because sufficient evidence supports the trial court's findings, the Vanderhoofs' adverse possession claim fails.

Mutual Recognition and Acquiescence

The Vanderhoofs also claim that the trial court erred "in concluding that there was insufficient evidence that the fence was recognized and acquiesced to as the boundary by the property owners on both sides." The doctrine of mutual recognition and acquiescence supplements the doctrine of adverse possession.[23] To establish property ownership under this doctrine, a plaintiff must prove three

[21] Anderson v. Hudak, 80 Wn. App. 398, 404, 907 P.2d 305 (1995).
[22] See Maier v. Giske, 154 Wn. App. 6, 19-20, 223 P.3d 1265 (2010) (declining to find adverse possession where a claimant merely planted trees in an area of wild vegetation and there was no "clear visual difference" between the area of the property where she planted trees and where she planted no trees).
[23] Lloyd v. Montecucco, 83 Wn. App. 846, 855, 924 P.2d 927 (1996).

elements by clear, cogent, and convincing evidence: (1) the line is certain, well defined, and physically designated upon the ground; (2) in the absence of an express agreement establishing the designated line as the boundary line, the adjoining landowners, or their predecessors in interest, in good faith manifested, by their acts, occupancy, and improvements with respect to their respective properties, a mutual recognition and acceptance of the designated line as the true boundary line; and (3) the requisite mutual recognition and acquiescence in the line continued for that period of time required to secure property by adverse possession.[24] A claimant cannot establish acquiescence in a boundary line through unilateral acts.[25]

In the absence of an express agreement that a fence between properties is a true boundary line, "'mere acquiescence in its existence is not sufficient to establish a claim of title to a disputed strip of ground.'"[26] Instead, "an acquiescence must consist in recognition of the fence as a true boundary line and not mere acquiescence in the existence of a fence as a barrier."[27]

The Vanderhoofs contend, "[T]he testimony clearly supports the notion that the original grantor (Liljedahls) and the original grantee (Lothrops) agreed to the boundary upon erecting the fence, as both parties participated in the location

---

[24] Green v. Hooper, 149 Wn. App. 627, 641, 205 P.3d 134 (2009) (quoting Lamm v. McTighe, 72 Wn.2d 587, 593, 434 P.2d 565 (1967)).

[25] Heriot v. Smith, 35 Wn. App. 496, 501, 668 P.2d 589 (1983) (citing Houplin v. Stoen, 72 Wn.2d 131, 431 P.2d 998 (1967)).

[26] Green, 149 Wn. App. at 641-42 (internal quotation marks omitted) (quoting Lamm, 72 Wn. 2d at 592).

[27] Green, 149 Wn. App. at 642 (citing Lamm, 72 Wn. 2d at 592).

and erection of the fence in the 1970s." They also claim, "Throughout all the previous ownerships, no owners of the Lothrop property ever challenged the fence line or sought to use the property to the south of the line."

The parties agree that no physical designations on the ground reflect the southern boundary indicated in the survey of the Mills' property. No evidence shows that either Mills or their predecessors recognized the fence as a true boundary. Mr. Vanderhoof testified that he had no firsthand knowledge of anything that took place on his property before he acquired it in 1999. He also stated that the fence was allowed to decay. The Vanderhoofs presented no evidence indicating that the Blacks, the Abelsons, or the Donna Nagy Trust recognized, through words or conduct, the fence as the property's southern boundary. Mr. Lothrop was the only former owner of the Mills' property who testified at trial.

The Mills' purported nonuse of the disputed area does not establish the necessary clear and convincing proof that both parties acquiesced in the fence line as the true boundary. Mr. Lothrop testified at trial that he "can't remember even thinking it—thinking it was a boundary line." He further stated, "As I remember when I owned that property I never gave any thought to boundary lines at all because I thought they were—who cares?" When asked whether the survey or the fence should govern the boundary, Mr. Lothrop testified, "There's description of the property that's been legally put into effect[,] I believe."

At trial, Mr. Vanderhoof, who represented himself, impeached Mr. Lothrop with a prior inconsistent statement, in which Mr. Lothrop stated, "At the time I considered the fences to be the boundary of our property. I never made any use of our property outside of our fences, we owned it."[28] ER 613(b) permits impeaching a witness with a prior inconsistent statement.[29] But prior inconsistent statements do not constitute substantive evidence; rather, "they may be considered only to determine witness credibility."[30] We defer to the trial court on issues of witness credibility.[31]

The Vanderhoofs state that they each had conversations with Mr. Mills in which "Mr. Mills sought permission to remove a tree within the disputed area." They claim, "Clearly the Mills acquiesced to the previously and currently well-defined and mutually agreed upon boundary as logically, one does not seek permission to maintain their own property."

Mr. Vanderhoof testified that Mr. Mills "told me that the tree cutter that he had hired to remove trees had identified one tree, one Douglas fir that was mostly on the south side of the fence line but partially on the fence line as a hazard tree and wanted to know if it was okay to cut it down." Mr. Vanderhoof

---

[28] The record does not contain this declaration.

[29] ER 613(b) states,
Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

[30] State v. Garland, 169 Wn. App. 869, 886, 282 P.3d 1137 (2012).

[31] State v. Tyler, ___ Wn.2d ___, 302 P.3d 165, 178 (2013).

also stated that he told Mr. Mills, "[Y]ou have my permission to fall it onto our property. And he did." Mrs. Vanderhoof testified that Mr. Mills asked her "if it was okay—if they could do something about getting some of the trees out of there because Hedy wanted—needed more light on her house . . . and to me that implied that they were our trees." She further stated that she "never made a plan for managing the trees." Although the Vanderhoofs argue that "one does not seek permission to maintain their own property," the testimony indicates that Mr. Mills simply requested to fall the tree onto the Vanderhoofs' property. The record does not show that the Mills requested that the Vanderhoofs remove the trees or otherwise suggested that the trees were on the Vanderhoofs' land. Contrary to the Vanderhoofs' assertion, these conversations fail to establish the necessary clear and convincing proof that both parties acquiesced in the fence line as the true boundary.

## Conclusion

Because substantial evidence supports the trial court's findings that the Vanderhoofs failed to establish adverse possession or mutual recognition and acquiescence, we affirm the court's order quieting title in favor of Mills.

_Leach, C.J._

WE CONCUR:

_Cox, J._

-17-